2026 IL App (1st) 240509-U

No. 1-24-0509

Order filed June 30, 2026

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 6043 |
| | ) | |
| TERRANCE LAMBERT, | ) | Honorable |
| | ) | James Bryan Novy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

### ORDER

¶ 1   *Held*: We affirm defendant's conviction for first degree murder where the evidence was sufficient to show he knew his acts created a strong probability of death or great bodily harm.

¶ 2   Following a bench trial, defendant Terrance Lambert was found guilty of the first degree murder of Joseph Smith and sentenced to 20 years' imprisonment. On appeal, defendant contends that his conviction should be reduced to manslaughter because the evidence showed he acted recklessly. Alternatively, he argues his conviction should be reduced to second degree murder

because he proved by a preponderance of the evidence that he unreasonably acted in self-defense. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Defendant was charged by indictment with two counts of first degree murder following an incident in Chicago on May 29, 2020, when he punched Smith while on a Chicago Transit Authority (CTA) train station platform, causing Smith to fall onto the tracks and be struck by a train. Count I alleged that defendant intentionally or knowingly killed Smith (720 ILCS 5/9-1(a)(1) (West Supp. 2019)), while count II alleged that defendant punched Smith knowing that the act created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West Supp. 2019)).

¶ 5    Prior to trial, defendant received behavioral clinical examinations from three psychiatrists, as he had a history of diagnosed schizophrenia. All three psychiatrists concluded that defendant was legally sane because, at the time of the offense, he did not lack a substantial capacity to appreciate the criminality of his conduct. Also prior to trial, defendant informed the court he intended to pursue the affirmative defense of self-defense.

¶ 6    At trial, CTA train operator Kevin Taylor testified that, on May 29, 2020, at about 12:05 a.m., he was operating a northbound CTA train on the Red Line. As the train entered the 87th Street Station, Taylor had an unobstructed view of the train platform to his left, where he saw defendant and Smith walking toward the train. Defendant, whom Taylor identified in court, approached Smith from behind and punched him on the right side of his face. Smith stumbled, lost his balance, and fell onto the train track. Taylor stopped the train and asked defendant why he punched Smith, but defendant did not respond.

¶ 7    On cross-examination, Taylor elaborated that defendant punched Smith; then, defendant continued with his "whole body," "nudg[ing]" Smith. Taylor described the nudge as a "little push" with "the force that [defendant] would use to get [Smith] off his balance."

¶ 8    The State entered photographs and a video from a surveillance camera at the train station. The video, which does not feature audio, is included in the record on appeal and this court has reviewed it.

¶ 9    In the video, a man whom Taylor identified as Smith paces on the station platform. About two minutes later, another man, whom Taylor identified as defendant, walks onto the platform and also paces. At one point, Smith stops pacing and faces south, in the direction from which the train would arrive. Defendant stops in the center of the platform behind Smith.

¶ 10    Smith turns, faces defendant, and appears to say something while making quick gestures with his hands at waist level. Smith then turns from defendant and walks down the platform, outside the blue safety edge. In the direction in which Smith is walking, headlights from an oncoming train approach on the northbound track. Defendant, who is standing behind Smith, looks south toward Smith and the approaching train.

¶ 11    As the train is about to pass Smith, defendant runs toward Smith, facing Smith and the oncoming train. Defendant maneuvers to the center of the platform so that Smith is between him and the train tracks. Defendant then draws back his right arm and punches Smith in the right side of the face. Defendant's body also appears to bump into Smith. As Smith stumbles to the left toward the train track, defendant extends his left arm towards Smith and back; it is not clear if defendant's left arm contacts Smith. Defendant quickly lowers his left foot and jumps back from the direction of the train tracks. Smith falls onto the tracks and is struck by the train. Defendant

runs down the platform for a few steps while looking back. He then stops running, turns, and walks toward the camera, glancing toward Smith's body. The train's conductor opens his window and says something to defendant, who walks out of frame.

¶ 12    James Hayes testified that on May 29, 2020, he was working at a gas station when defendant entered the gas station store wearing a denim jacket. Defendant, identified by Hayes in court, approached the register counter looking toward the store's surveillance monitors. He then walked around the store looking agitated and returned to the counter no longer wearing his jacket. Defendant bought a bottle of Sprite and exited the store after Hayes asked him to leave. Outside the storefront, defendant poured out some of the Sprite and placed a few pills in the bottle. He then shook the bottle and drank from it. Afterwards, Hayes found defendant's jacket in an aisle of the store.

¶ 13    The State entered footage from inside the gas station store, filmed by two cameras at different angles. The videos, which do not feature audio, are included in the record on appeal and this court has reviewed them. In the videos, defendant enters the store wearing the blue denim jacket. He fidgets and looks around before partially removing his jacket and leaving it hanging on one arm. He then leaves something with the cashier and walks out of frame. When defendant reenters the frame, he is no longer wearing the jacket but is holding a bottle of Sprite. He purchases the Sprite and leaves the store.

¶ 14    Chicago police officer Pilch testified that on May 29, 2020, at about 12:16 a.m., he responded to the CTA Red Line's 87th Street Station.[1] There, defendant approached him and said, "I did that." Pilch placed defendant in custody and escorted him to Pilch's vehicle, where defendant

---

[1] Officer Pilch's first name does not appear in the transcript of the trial proceedings.

told Pilch "what he did." The State published a video from Pilch's bodyworn camera. We have also reviewed this video, which is in the record on appeal.

¶ 15    In the video, Pilch guides people out of the 87th Street Station. Defendant, whom Pilch identified in court, enters the station carrying a Sprite bottle. He approaches Pilch and says he has something to say. Defendant then tells Pilch, "I'm the one who did that. Did that to the guy." Pilch retrieves his handcuffs, and defendant turns around with his arms behind his back. Pilch handcuffs defendant and escorts him out of the station. Pilch asks defendant if he knew the victim. Defendant responds that he did not. Defendant tells Pilch that Smith said "something" to him and "walked off." Defendant says he then "had to punch" Smith, who "fell." Defendant then seems to say that "it was an accident." Pilch asks defendant what Smith had said that made defendant punch Smith. Defendant begins to answer but stops and says he was diagnosed with schizophrenia.

¶ 16    On cross-examination, Pilch stated that defendant was cooperative. Pilch confirmed that, once outside the station, defendant told Pilch that "it was an accident."

¶ 17    The parties stipulated that, if called, a Cook County assistant medical examiner would testify that she conducted Smith's autopsy and observed multiple injuries, including spinal fractures, broken ribs, and lacerations and hemorrhaging in his internal organs. The examiner would opine that Smith's cause of death was multiple injuries after being pushed from a platform and struck by a train, and the manner of death was homicide.

¶ 18    Defendant testified that he was diagnosed with schizophrenia around October 2018. His schizophrenia caused him to hear voices. He was prescribed Zyprexa, which relieved that symptom and calmed him. On May 28, 2020, the day before the incident, defendant had been off Zyprexa for one or two months, and the voices were "louder." He was depressed and planned to commit

suicide. He went to his sister's residence and bought 30 pills of Xanax from a friend nearby. His sister then dropped him off at the 87th Street Station so he could take the Red Line back home.

¶ 19    While waiting for the train on the station platform, defendant paced and felt "excited" because he was about to commit suicide. Smith, whom defendant had never seen before, approached "very aggressively." Smith said something "very aggressive." Defendant could not recall Smith's exact words but testified that Smith said "he was going to hit [defendant] or something like that." While Smith did not make any movements toward defendant, Smith's "body language [was] very aggressive" and he was moving his hands in front of his body. Defendant did not see a weapon on Smith. Defendant felt a need to defend himself because he "didn't know what [Smith] was going to do" and thought Smith would "attack" or "do something to" him.

¶ 20    Smith turned and walked away from defendant, who then "blanked out." Using his right hand in a closed fist, defendant punched Smith once on the right side of his face. Defendant first noticed the approaching train after he punched Smith, who fell toward the train track. Defendant reached with his left hand to grab Smith and "[s]ave his life," but failed. Smith fell onto the train track and was struck by the train.

¶ 21    Defendant testified that he was shocked because it was an "accident." He denied intending to kill Smith or to have him hit by a train. Defendant ran to a gas station, left his jacket in an aisle there, and purchased a Sprite. Outside the gas station, he placed the Xanax in his Sprite, but the bottle overflowed and he did not drink it. Defendant then returned to the train station, where he told an officer what happened.

¶ 22    On cross-examination, defendant confirmed that he voluntarily stopped taking Zyprexa without telling his doctor because he did not like the side effects. Defendant denied knowing how

close Smith was to the train track when defendant punched Smith, because defendant had "blanked out" and "wasn't paying attention to it." Defendant also denied that Smith ever walked faster toward him, moved his body closer to him, or raised his arm or hand toward him. Defendant's interaction with Smith lasted less than 10 seconds. Smith was walking away from defendant and not talking to him anymore when defendant thought he had to defend himself. Defendant confirmed knowing that a person generally could fall after being punched, but denied knowing Smith could have fallen. He confirmed that, based on the Red Line surveillance footage, the train was close to him and Smith when he punched Smith.

¶ 23    Over the State's objection, the trial court allowed defendant's motion to introduce certified copies of Smith's convictions for robbery and misdemeanor battery.

¶ 24    In rebuttal, the State entered a stipulation that, if called, licensed clinical psychologist Dr. Erick Neu would opine that defendant was legally sane at the time of the offense. Dr. Neu would further opine that, while defendant's mental illness may have impaired his judgment, there was no indication his symptoms were so severe that he lacked the substantial capacity to appreciate the criminality of his conduct.

¶ 25    During closing arguments, the State asserted that defendant was "[t]he only aggressor" when he ran after Smith and punched him in the head from behind. Defense counsel argued that defendant acted in self-defense, as Smith approached defendant acting aggressively, and defendant "believed in his mind he needed to defend himself." Counsel noted that defendant was "not in a great state of mind" and suffering from schizophrenia. Counsel maintained that the evidence, "if anything," showed that defendant acted recklessly and thus committed involuntary manslaughter.

¶ 26    The trial court found defendant guilty of count II for first degree murder, predicated on knowing his acts created a strong probability of death or great bodily harm. The court acquitted defendant of murder on count I.

¶ 27    In ruling, the court rejected defendant's self-defense theory, explaining no evidence showed "what specific, aggressive language" or "aggressive movements" Smith allegedly used toward defendant. Further, Smith was walking away from defendant when defendant struck him. The court found defendant knew his acts created a strong probability of death or great bodily harm to Smith, explaining that defendant ran toward Smith in a "looping manner" from right to left so that his momentum and force increased as he struck Smith in the head. The force at that point was great enough to knock Smith onto the train track. The court also rejected that defendant unreasonably believed he was defending himself, finding his testimony to that effect "self-serving" and incredible.

¶ 28    Defendant filed a motion to reconsider or for a new trial, alleging that the State failed to prove beyond a reasonable doubt that he had knowingly or intentionally caused Smith's death. He alleged that, if his actions amounted to "anything criminal," it would be involuntary manslaughter. Further, defendant claimed that the State failed to prove beyond a reasonable doubt that defendant was not justified in punching Smith to defend himself.

¶ 29    The trial court denied defendant's posttrial motion. After a hearing, it sentenced defendant to 20 years' imprisonment.

¶ 30                                II. ANALYSIS

¶ 31    On appeal, defendant first contends that he should have been convicted of manslaughter because the evidence showed he acted recklessly, without the requisite mental state of knowledge to commit first degree murder.

¶ 32    When a defendant challenges the sufficiency of the evidence at trial, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Johnson*, 2026 IL 131337, ¶ 59 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact resolves conflicts in testimony, weighs evidence, and draws reasonable inferences from the facts. *People v. Sauls*, 2022 IL 127732, ¶ 52. Therefore, we will not substitute our judgment for that of the trier of fact on issues regarding the weight of the evidence and credibility, nor will we retry the defendant. *Johnson*, 2026 IL 131337, ¶ 59. The *Jackson* standard applies to both direct and circumstantial evidence, and circumstantial evidence that meets this standard is sufficient to sustain a conviction. *People v. Aljohani*, 2022 IL 127037, ¶ 66. We will set aside a conviction only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Bush*, 2023 IL 128747, ¶ 33.

¶ 33    Defendant does not dispute that he punched Smith, causing him to fall on the tracks and be struck by an oncoming train. Rather, defendant only argues that the State failed to prove he had the requisite mental state of knowledge, *i.e.*, that he knew punching Smith would create a strong probability of death or great bodily harm to Smith. He maintains that his actions were reckless and therefore requests that his first degree murder conviction be reduced to involuntary manslaughter.

¶ 34    The difference between first degree murder and involuntary manslaughter lies in the defendant's mental state. *People v. McDonald*, 2016 IL 118882, ¶ 51. In order to sustain

defendant's conviction for first degree murder, the State had to prove beyond a reasonable doubt that defendant killed Smith without lawful justification and, in performing the acts that caused Smith's death, knew that such acts created a strong probability of death or great bodily harm to Smith. 720 ILCS 5/9-1(a)(2) (West Supp. 2019).

¶ 35    A person acts with knowledge of the result of his or her conduct when "he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2020). Knowledge is often proven by circumstantial evidence because it is the mental element of an offense and, as such, rarely proven by direct evidence. *People v. Leib*, 2022 IL 126645, ¶ 37. An admission is not required for the trier of fact to conclude the defendant had knowledge of something. *Id.* "A defendant is presumed to intend the natural and probable consequences of his or her acts." *People v. Mulosmani*, 2022 IL App (1st) 200635, ¶ 65.

¶ 36    A defendant commits involuntary manslaughter, on the other hand, when he recklessly performs acts likely to cause death or great bodily harm to another. 720 ILCS 5/9-3(a) (West 2020). Recklessness occurs when a person "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2020).

¶ 37    After viewing the evidence in the light most favorable to the prosecution, as we must, we find the evidence sufficient to support the court's conclusion that defendant knew his act of punching Smith, who was standing near the edge of a train platform as a train approached, created a strong probability of death or great bodily harm. Taylor, the train operator, testified that he saw defendant approach Smith from behind and punch Smith, with defendant's "whole body" nudging

Smith with enough force to knock Smith off balance so that he fell off the platform. See *People v. Givens*, 364 Ill. App. 3d 37, 44-45 (2005) (evidence sufficient to show the defendant intentionally killed the victim by pushing the victim down five stairs onto a concrete landing in a train station).

¶ 38    Taylor's testimony was corroborated by video of the incident. The video shows Smith had briefly interacted with defendant before turning and walking away. Defendant, who was looking toward Smith and the approaching train, ran toward Smith. As the train was about to pass Smith, defendant maneuvered to the center of the platform, placing Smith between him and the approaching train. Defendant drew back his right arm and punched Smith, knocking Smith back in the direction of the train. The video shows defendant stomping down and jumping away, as if to break his own momentum toward the tracks. Smith, however, immediately fell off the platform and onto the tracks. Given the precise timing of the punch as the train arrived and the fact that defendant was facing the train throughout the incident, a reasonable trier of fact could have found defendant knew his actions created a strong probability of death or great bodily harm as opposed to being reckless behavior. See *Bush*, 2023 IL 128747, ¶ 33 (the trier of fact is not required to disregard inferences which flow normally from the evidence before it); see also *People v. Williams*, 2016 IL App (1st) 133459, ¶ 40 (evidence sufficient to support murder conviction, on accountability theory, where a codefendant pushed the victim onto a train track, which electrified the victim). Therefore, we cannot say that the evidence presented is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt.

¶ 39    Defendant nevertheless argues he did not know that punching Smith would cause his death, as evidenced by defendant's own testimony that he did not know a train was approaching, did not realize how close Smith was to the tracks, did not mean for Smith to fall onto the tracks, and was

shocked after the incident. However, the trial court was not required to accept defendant's own explanations for his conduct. See *Bush*, 2023 IL 128747, ¶ 36. Rather, as the trier of fact, the court was tasked with making credibility determinations, weighing evidence, and drawing reasonable inferences therefrom. See *Sauls*, 2022 IL 127732, ¶ 52. The trial court found defendant's testimony incredible, and it is not this court's role to substitute our judgment for that of the trier of fact. See *Johnson*, 2026 IL 131337, ¶ 59.

¶ 40    Defendant also argues that, because of his mental health condition, he lacked the "capacity" to form the mental state of knowledge and was unable to "consider any consequences" of his actions. The State responds that defendant is essentially raising the affirmative defense of "diminished capacity," under which a " 'legally sane defendant [presents] evidence of mental illness to negate the specific intent required to commit a particular crime.' " *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 63 (quoting *Metrish v. Lancaster*, 569 U.S. 351, 351 (2013)). However, Illinois has rejected diminished capacity as an affirmative defense. See *People v. Hulitt*, 361 Ill. App. 3d 634, 641 (2005).

¶ 41    Defendant argues in reply that this court has more recently held that "[t]he fact that evidence of a defendant's mental illness, short of insanity, cannot serve as an affirmative defense should not mean, necessarily and automatically, that such evidence could never be relevant and otherwise admissible in a particular case to rebut evidence of *mens rea*." *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 131 (plurality opinion). The court in *Valdez* further held that Illinois courts "should determine the admissibility of mental-deficiency evidence to rebut *mens rea* like they consider admissibility of any other evidence in Illinois—on a case-by-case basis, by applying [the] Illinois Rules of Evidence." *Id.* ¶ 138. Acknowledging that he was found to be legally sane at the

time of the offense, defendant asserts that, under *Valdez*, evidence of his mental illness could be considered not as an affirmative defense, but as relevant evidence rebutting the State's position that he acted knowingly in killing Smith. See *id.* ¶ 117 (an affirmative defense does not attack the State's proof but rather presupposes the defendant's guilt and provides a ground to wholly or partially excuse the defendant from criminal responsibility). Indeed, our supreme court has cited *Valdez* approvingly, albeit in the context of voluntary intoxication, for the proposition that whether a doctrine is recognized as an affirmative defense is a different question from whether certain evidence is admissible to disprove an element of the charged crime under the facts of a particular case. See *People v. Grayer*, 2023 IL 128871, ¶ 24 (citing *Valdez*, 2022 IL App (1st) 181463, ¶ 116).

¶ 42 Even considering evidence of defendant's mental illness as relevant, however, our holding remains the same. First, the evidence at trial showed that defendant's mental illness did not affect his ability to appreciate the criminality of his conduct. In rebuttal, the State presented evidence by way of stipulation that, if called, a licensed clinical psychologist would testify that, while defendant's mental illness may have impaired his judgment, there was no indication his symptoms were so severe that he lacked the substantial capacity to appreciate the criminality of his conduct. As such, the trial court was "not required to disregard the reasonable inferences that naturally flow[ed] from" the evidence before it (*People v. Brooks*, 2023 IL App (1st) 200435, ¶ 37), *i.e.*, that defendant knew his actions of punching Smith, who was standing on the edge of the platform as a train approached, created a strong probability of death or great bodily harm to Smith.

¶ 43 Moreover, the evidence at trial showed that defendant was aware of his actions and the consequences they carried, as he immediately attempted to distance himself from the crime. Just

after hitting Smith, defendant left the train station and went to a gas station store, where he left his jacket. He soon after returned to the station and surrendered to the police. A reasonable trier of fact could have inferred from this evidence that, regardless of defendant's diagnosed schizophrenia, he still acted knowingly when he punched Smith. 720 ILCS 5/4-5(b) (West 2020) (defining knowledge); *Leib*, 2022 IL 126645, ¶ 37 (knowledge is often proved by circumstantial evidence). For these reasons, we find the evidence was sufficient to establish defendant's guilt of first degree murder.

¶ 44    In the alternative, defendant contends that this court should reduce his conviction to second degree murder because he acted under an unreasonable belief that self-defense was necessary. Defendant argues that, based on his mental health crisis, which included hearing voices, he unreasonably believed Smith was acting aggressively toward him and that he needed to defend himself. He maintains that the video from the train station corroborated this defense, as it showed Smith briefly speaking to defendant on the platform and gesturing.

¶ 45    To reduce a charge from first to second degree murder, a defendant bears the burden of proving by a preponderance of the evidence that a mitigating factor was present at the time of the killing, one factor being that the defendant had an unreasonable belief in the need for self-defense, which is referred to as imperfect self-defense. 720 ILCS 5/9-2(a)(1)-(2), (c) (West 2020); *People v. Jeffries*, 164 Ill. 2d 104, 112-13 (1995).

¶ 46    Once a defendant has proven that he unreasonably acted in self-defense, the State must disprove that factor beyond a reasonable doubt. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 154. The presence of a mitigating factor, here imperfect self-defense, is a factual question for the trier of fact, and this court's task on review is not to reweigh the evidence and

substitute our judgment for that of the finder of fact. *People v. Castejon*, 2025 IL App (1st) 221918, ¶ 178. When a defendant contends that his first degree murder conviction should be reduced to second degree murder, we must consider whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." (Internal quotation marks omitted.) *Castellano*, 2015 IL App (1st) 133874, ¶ 144.

¶ 47     Imperfect self-defense "occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable." *People v. Jeffries*, 164 Ill. 2d at 113. As such, to be found guilty of second degree murder based on an unreasonable belief in self-defense, the defendant must prove by a preponderance of the evidence that the other five elements of self-defense existed. *Castellano*, 2015 IL App (1st) 133874, ¶ 149; *People v. Mujkovic*, 2022 IL App (1st) 200717, ¶ 26. These five elements are: (1) force was threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; and (5) he actually and subjectively believed a danger existed requiring the use of the force applied. *People v. Vesey*, 2026 IL 130919, ¶ 42.

¶ 48     In reviewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have concluded that defendant did not act with an unreasonable belief that self-defense was justified because the State disproved four of the first five elements of self-defense. Specifically, the evidence showed that defendant was the aggressor, and not in imminent danger, as he chased after Smith, who was walking away when defendant punched him. See *id.* (elements of self-defense); see also *People v. Guja*, 2016 IL App (1st) 140046, ¶ 54 ("[T]he right of self-defense does not permit one to pursue and inflict injury upon even an initial aggressor."). The

State's evidence also showed that Smith never threatened defendant with force of any kind, much less unlawful force. See *Vesey*, 2026 IL 130919, ¶ 42. Therefore, the State negated at least four of the elements of self-defense, namely, that (1) force was threatened against defendant; (2) defendant was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful. *Id.*

¶ 49    As noted by the trial court, no evidence explained why defendant believed, even unreasonably, that he needed to defend himself. Consistent with the State's evidence, defendant also acknowledged that Smith was no longer speaking and was walking away when defendant punched Smith. Defendant could not identify any specific aggressive movements made by Smith, nor could he specifically recall anything that Smith said to him. While defendant attributes his acts to his schizophrenia and hearing voices, there was also no evidence as to how exactly his condition led him to believe he needed to defend himself as Smith was walking away. Thus, defendant failed to meet his burden in proving by a preponderance of the evidence that he acted in imperfect self-defense. See 720 ILCS 5/9-2(a)(2), (c) (West 2020). See *People v. Bennett*, 2017 IL App (1st) 151619, ¶¶ 44-45 (the trial court was "free to reject" the defendant's argument that he acted in unreasonable self-defense, where witness testimony showed that the victim had ceased to make threatening actions or statements when the defendant returned to confront the victim and shot him). Based on the record, we cannot say that the evidence at trial was so improbable or unsatisfactory that it could not support the trial court's conclusions. *Bush*, 2023 IL 128747, ¶ 33. We therefore will not disturb the trial court's findings on review.

¶ 50    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 51    Affirmed.